UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-106(1) (NEB/DTS)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OLUMIDE OBIDARE, | ) |
| a/k/a REMY ADAMSON, | ) |
| a/k/a MICHEAL BRYAN, | ) |
| a/k/a M.H., | ) **GOVERNMENT'S POSITION WITH** |
| a/k/a REMY JENSON, | ) **RESPECT TO SENTENCING** |
| a/k/a JADEN MICHEL, | ) |
| a/k/a MATTEW MIHEL, | ) |
| a/k/a ISRIAELI MIKEL, | ) |
| a/k/a ALLEN PETERSON, | ) |
| a/k/a DANIEL THOMPSON, | ) |
| a/k/a DON WILLIAMS, | ) |
| | |
| Defendant. | |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Kimberly A. Svendsen, Assistant United States Attorney, submits this memorandum in connection with the sentencing of defendant Olumide Obidare.

On March 14, 2022, Obidare pled guilty to conspiring with others to defraud individuals and businesses by engaging in online scams, including business email compromises and online romance scams. The portion of the conspiracy attributable to Obidare's conduct included more than $2.1 million in fraud proceeds and resulted in substantial financial hardship to five or more victims. In addition, Obidare played an aggravating role as a manager or supervisor in the conspiracy. The government seeks a

sentence within the applicable Sentencing Guidelines range, which is appropriate to the criminal conduct to which Obidare pled guilty, including the serious breaches of victims' trust, the dollar amount associated with Obidare's conduct, and his relative culpability compared to that of his co-conspirator, Stephen Oseghale.

### Obidare's Criminal Conduct

For approximately five years, between 2016 and May 2021, Olumide Obidare acted as a manager or supervisor of a scheme to defraud businesses and individuals of their money using the Internet. During the course of the scheme, Obidare himself "persuaded individual romance fraud victims to send money for a variety of purposes," (Pl. Agr. ¶ 2(f)), and he also worked with co-conspirators who posed as people who they were not, gained the victims' trust, and exploited that trust to steal their money. In total, Obidare's conduct is directly tied to at least $2,114,893 in fraud resulting in substantial financial hardship to five or more victims. (PSR ¶ 29.)

Obidare and his co-conspirators used the Internet to steal money from victims primarily through two methods—business email compromises and romance scams. A business email compromise is an online scam in which the perpetrator poses as a known or trusted person, typically a vendor of the victim company, and provides the victim company with instructions to wire funds to pay the vendor for goods or services. (*Id.* ¶ 11.) In reality, the wiring instructions are connected to a bank account controlled by the scammers. For example, in 2017, members of Obidare's conspiracy caused a Minnesota company to wire approximately $838,000 to an account that Obidare controlled under the false identity

"Remy Jenson." (*Id.* ¶¶ 22-24.) Obidare then diverted some of those funds to himself and his co-conspirators, including by purchasing a money order directed to his wife. (*Id.* ¶ 24.)

To carry out a romance scam, the co-conspirators pursue fraudulent online romantic relationships with victims to gain their trust and then persuade the victims to send them money for various false purposes, such as claimed legal fees, costs for businesses, or other purported financial needs. (*Id.* ¶ 12.) For example, between 2016 and 2018, a victim in Texas believed he was in a romantic relationship with a woman named "Laurie Curtis." (*Id.* ¶ 25.) "Curtis" requested the victim to send money for her to assist in settling her deceased father's estate. (*Id.*) The victim ultimately sent at least $250,000 to accounts controlled by Obidare using three different false identities. (*Id.*) Similarly, in 2018, a victim in Texas believed she was in a romantic relationship with a person named "David Palmer," who claimed to be a building contractor in Ireland. (*Id.* ¶ 26.) "Palmer" requested the victim to send money for him to pay his employees so he could come to the United States and marry her. (*Id.*) This victim sent more than $87,000 to accounts Obidare controlled using two different false identities.

As part of his role in the scheme, as part of his role in the scheme, Obidare "persuaded individual romance fraud victims to send money for a variety of purposes, including to pay for purported legal fees and other costs related to travel, business, and claims of inheritance." (Pl. Agr. ¶ 2(f).) Obdiare also personally used the identity of M.H., a real person, to obtain false documents and to pursue false romantic relationships online with individual victims. (*Id.*)

Obidare obtained false identification documents, including foreign passports and driver's licenses, and also assisted his co-conspirators in doing so. (*Id.* ¶ 2(g).) Obidare used these false identification documents to open bank accounts at various banks in the United States. (*Id.*) He then directed co-conspirators to transfer proceeds of online romance scams and business email compromises to these bank accounts that Obidare controlled. (*Id.* ¶ 2(h).) Obidare then diverted these funds to his own use and that of his co-conspirators. (*Id.*) Obidare used means of identification of real people that he obtained from his co-conspirators to facilitate the transfer of the fraudulently obtained funds. (PSR ¶ 20.) Obidare typically retained between 10 and 20 percent as a fee for funneling money in furtherance of the conspiracy, or more when he was conducting his own romance scam interactions with victims. (*Id.* ¶ 21.)

## The Presentence Investigation Report

Both parties agree with the Guideline calculations contained in the PSR. The PSR correctly calculated Obidare's total offense level as 31 and his criminal history category as I. Obidare's offense level includes a 16-level enhancement because the loss amount attributable to him was more than $1.5 million but less than $3.5 million, a 4-level enhancement because the offense caused substantial financial hardship to five or more victims, a 2-level enhancement because a substantial part of the scheme was committed from outside the United States and the offense involved sophisticated means, a 2-level enhancement because the offense involved the production or trafficking of any unauthorized access device or counterfeit access device, and the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of

4

identification, including fraudulent passports and driver's licenses, and a 3-level enhancement for being a manager or supervisor. (PSR ¶¶ 39 & 43.) Obidare's offense level also includes a three-level reduction for acceptance of responsibility. (PSR ¶¶ 47-48.)

As a result of Obidare's total offense level of 31 and criminal history category of I, plus the mandatory consecutive 24-month sentence applicable as a result of Obidare's guilty plea to aggravated identity theft in Count 13, the undisputed advisory Guidelines range is 108 to 135 months' imprisonment, plus 24 months. (*Id.* ¶¶ 92-93.)

## The Appropriate Sentence

Obidare served as a manager or supervisor of a conspiracy that defrauded dozens of victims out of more than $2 million. The scheme to which Obidare pled guilty was sophisticated and required substantial planning, including running many different types of schemes and keeping track of the many false identities being used to communicate with the victims of the scheme and to operate the various bank accounts. In addition to preying on many victims, the scheme targeted people when they were at their most vulnerable—often people who believed they were communicating with a loved one who was in trouble.

The victim impact statements submitted to the Court in this case illustrate the magnitude of the harm Obidare's fraud caused them. Beyond the financial losses, people impacted by the fraud scheme detailed strain on marriages and personal relationships, the need to hire lawyers to sort out their finances, the loss of retirement funds and children's college money, and feelings of betrayal and shame. Some described having recently lost spouses of many years, finally being ready to meet someone again, and unknowingly

becoming involved with Obidare and his co-defendants. As one example out of many, Victim J.M. from Florida reported the following:

> I have reached a golden time in my life when I should be enjoying everyday without any financial worries. Inherited money had been set aside so that I <u>would've</u> lived comfortably. But instead, I worry that I will be forced to sell my home. I'd need to move in with one of my children, and be a burden to them.
>
> I have been doing without on things that need to be done. I have bone on bone in both knees, and deal with pain daily. Since I'm now on Medicare, I would have to pay a portion of the hospital stay if I had replacements. I haven't been to the dentist for 3 years, nor the eye doctor for 5 ½ years. Also, I haven't been to see the dermatologist. I can't pamper myself with massages, pedicures or a visit to the hair salon.
>
> Home maintenance has been put off. My windows haven't been cleaned for 4 years. Since there are 13 in my home, it is too big of a job for me to do. Also, the dryer vent needs professionally cleaned. These things may sound minor to you, but they are major items I can't afford on a monthly income of $1,586.50, and yearly income of $19,038.00.
>
> There is condo insurance, HCA, property tax, home appliance insurance, auto insurance, auto maintenance, phone, electric and groceries I'm responsible for, on my meager income. I live 1,250 miles from my family, and am lucky if I see them twice a year. This has been extremely hard on me as I can't afford flights more often.
>
> Being involved in the money scam has changed my personality. I'm more subdued, and worry someone might find out what an embarrassment I am. I don't sleep as well, worry about money matters, and how I will survive on my own. I buy the basic groceries, pay my monthly expenses, limit using my car, can't dine out, attend concerts, nor go on cruises. Instead I stay home along, watching television. . . .
>
> Each time the man made up an excuse in asking for money, he would "promise" to repay me. I believe it is only fair that I be compensated on my behalf. Turning this man in was the right thing to do, and having the law find him is a great relief. This will insure he be punished for taking advantage of innocent women like myself. He has to live with what he did, and face the consequences of his wrong doing.

> No one is perfect, and so I've forgiven myself for being so gullible. I would just like to continue living my life and try to forget this nightmare.

J.M.'s experience is consistent with that of so many other victims of this fraud scheme.

This was not a one-time mistake. Obidare made the decision on many different days over the course of 5 years to participate in a large-scale scheme to steal money from people who believed they were sending money to someone they trusted. Obidare was required to engage in a substantial amount of planning to do so—he obtained false passports and driver's licenses from the United Kingdom in at least three different names. He used those fraudulent documents to open a variety of bank accounts into which the scammers could direct their proceeds. He kept a 10 to 20 percent fee for using his accounts to funnel those proceeds. And, at times he communicated directly with romance scam victims.

Online scams like those perpetrated by Obidare and his co-conspirators prey on the trust of individual victims and result in substantial harm beyond the financial losses they cause. Given the number of online accounts, bank accounts, false identities, and overseas connections involved, these crimes are often difficult to investigate and even more difficult to prosecute. A significant sentence of imprisonment is necessary to reflect the seriousness of the offense, to provide Obidare with just punishment, and to deter Obidare and others from committing similar offenses in the future.

Taking into consideration the Sentencing Guidelines, as well as the other factors required to be considered under § 3553(a), the United States respectfully suggests that a sentence between 132 and 159 months' imprisonment—within the appropriate applicable Sentencing Guidelines range—appropriately reflects the seriousness of Obidare's crime

while taking into account his mitigating circumstances, promotes respect for the law, provides a just punishment, protects the public from further online scams by Obdiare and others, and appropriately reflects Obidare's relative culpability .

Finally, it is undisputed that the Mandatory Victim Restitution Act applies. In the plea agreement, the parties agreed that the total amount of restitution to be ordered in this case is at least $2,114,893.91. (Pl. Agr. ¶ 10.) As the government did in connection with co-defendant Oseghale's sentencing, the government is in the process of ensuring the accuracy of this calculation and that each of the listed victims can be contacted. By the end of the week, the government will provide the Court and counsel with its final restitution calculation. In addition to any sentence of imprisonment, the government requests that the Court order Obidare to pay restitution to the victims of his fraud scheme.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant, Olumide Obidare, to a sentence of imprisonment within the appropriate applicable Sentencing Guidelines range and to pay restitution in the amount set forth in the PSR.

Dated: August 29, 2022                          Respectfully Submitted,

                                                ANDREW M. LUGER
                                                United States Attorney

                                                */s/ Kimberly A. Svendsen*

                                                BY: KIMBERLY A. SVENDSEN
                                                Assistant U.S. Attorney